## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| JOHN TIGHE on behalf of himself and all others similarly situated, | Case No. 4:23-cv-00537 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| AMTEL, LLC, and CONNECTIVITY SOURCE, LLC, d/b/a Connectivity Source, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, John Tighe, through his attorneys, brings this Class Action Complaint against the Defendants, Amtel, LLC ("Amtel") and Connectivity Source LLC, d/b/a Connectivity Source ("Connectivity Source") (together "Defendants"), alleging as follows:

### INTRODUCTION

1.      On April 19, 2023, Connectivity Source and Amtel, both of which are large T-Mobile and wireless retailers with hundreds of locations spanning throughout the United States, lost control over their computer network and the highly sensitive private information stored on the computer network in a data breach perpetrated by cybercriminals ("Data Breach"). The number of total breach victims is unknown, but on information and belief, the Data Breach has impacted at least thousands of former and current employees.

2.      On information and belief, the Data Breach began on or around April 19, 2023, when an unauthorized party gained access to Defendants'' network. Following an internal investigation, Defendants learned cybercriminals gained unauthorized access to former and current employees' personally identifiable information ("PII").

3.      On or around May 10, 2023 – almost an entire month after the Data Breach occurred – Defendants finally began notifying victims about the breach (the "Breach Notice") an example of which is attached as **Exhibit A**. However, Defendants have not yet completed notice and continues to notify breach victims.

4.      During this time, Plaintiff and Class Members were unaware that their PII had been compromised and published online, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm.

5.      Connectivity Source failed to reasonably secure, monitor, and maintain the PII provided to it by its former and current employees. Upon information and belief, the Data Breach resulted in the likely unauthorized access, download, exfiltration, and misuse of the PII by the cyber criminals who targeted that information through their wrongdoing.

6.      Defendants' Breach Notice obfuscated the nature of the breach and the threat it posted—refusing to tell its victims how many people were impacted, how the breach happened, or why it took the Defendants almost an entire month to begin notifying some of its victims that hackers had gained access to highly sensitive PII.

7.      Defendants' failure to timely detect and report the Data Breach made its employees vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

8.      Defendants knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

9.      In failing to adequately protect its employees' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendants violated state and federal

law and harmed an unknown number of its former and current employees.

10.     Plaintiff and members of the proposed Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiff and the Class trusted Defendants with their PII. But Defendants betrayed that trust. Defendants failed to properly use up-to-date security practices to prevent the Data Breach.

11.     Plaintiff is a former employee of Defendants and a Data Breach victim. Mr. Tighe worked at Connectivity Source from January 2021 to March 2021.

12.     Accordingly, Plaintiff, on behalf of himself and on behalf of a class of similarly situated individuals, brings this lawsuit seeking injunctive relief, damages, and restitution, together with costs and reasonable attorneys' fees, the calculation of which will be based on information in Defendants'' possession.

## PARTIES

13.     Plaintiff, John Tighe, is a natural person and citizen of Ohio, residing in Medina, Ohio, where he intends to remain. Mr. Tighe is a Data Breach victim, receiving Connectivity Source's Breach Notice on May 17, 2023.

14.     Defendant Amtel LLC is a Texas domestic limited liability company that maintains its principal place of business at 1046 Texan Trail, Grapevine, TX 76051, which is located in the Fort Worth Division of the Northern District of Texas. Amtel LLC was acquired by Defendants Connectivity Source, LLC on approximately February 3, 2023. Amtel LLC can be served through its Registered Agent Scott Aronstein, 3720 Dacoma St., Houston, TX 77092.

15.     Defendant, Connectivity Source, LLC is incorporated in Texas and maintains its principal place of business at 1046 Texan Trail, Grapevine, TX 76051, which is located in the Fort Worth Division of the Northern District of Texas. Connectivity Source, LLC can be served through its Registered Agent Scott Aronstein, 3720 Dacoma St., Houston, TX 77092.

## JURISDICTION & VENUE

16.    This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class; Plaintiff and Defendants are citizens of different states.

17.    Defendants are Texas entities with their principal place of business at 1046 Texan Trail, Grapevine, TX 76051, which is located in the Fort Worth Division of the Northern District of Texas.

18.    This Court has personal jurisdiction over Defendants because they are a citizen of this District and maintains its headquarters and principal place of business in this District.

19.    Venue is proper because Defendants maintain their headquarters and principal place of business in the Northern District of Texas.

## BACKGROUND FACTS

***Connectivity Source and Amtel***

20.    Connectivity Source and Amtel tout themselves as "one of T-Mobiles largest authorized retailers serving customers nationwide".[1] According to its website, Connectivity Source is "driven to connect [its] customers to their universe through wireless handsets, connected watches, and tablets from the world's top manufacturers."[2]  It boasts over $115.7 million in annual revenue.[3]

21.    On information and belief, Defendants accumulates highly sensitive PII Information of its employees.

---

[1] Connectivity Source, Homepage, https://connectivitysource.net/ (last visited May 23, 2023).
[2] *Id.*
[3] Connectivity Source, konaequity, https://www.konaequity.com/company/connectivity-source-4391242759/ (last visited May 23, 2023).

22. On information and belief, Defendants maintain former and current employees' PII for years after the employee-employer relationship is terminated.

23. In collecting and maintaining its employees' PII, Defendants agreed they would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

24. As "one of the largest and fastest growing"[4] mobile communications technology and service companies that believes in the "success of [its] team", Connectivity Source and Amtel understood the need to protect its current and former employees' PII and prioritize its data security.

25. Despite recognizing its duty to do so, on information and belief, Connectivity Source and Amtel have not implemented reasonably cybersecurity safeguards or policies to protect employee PII or trained their IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Defendants leave significant vulnerabilities in their systems for cybercriminals to exploit and gain access to employees' PII.

***Defendants Fail to Safeguard Employees' PII***

26. Plaintiff is a former employee of Connectivity Source.

27. As a condition of employment with Connectivity Source, Plaintiff provided Defendants with his PII, including but not limited to his name and Social Security number. Defendants used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII to obtain employment and payment for that employment.

28. On information and belief, Defendants collect and maintain employees' unencrypted PII in its computer systems.

---

[4] Connectivity Source, Linkedin, https://www.linkedin.com/company/connectivity-source_2/ (last visited May 23, 2023).

29.     In collecting and maintaining employees' PII, Defendants implicitly agree they will safeguard the data using reasonable means according to its internal policies, as well as state and federal law.

30.     According to the Breach Notice, Defendants claim that, on April 19, 2023, it was "notified of suspicious activity in its network environment". An internal investigation revealed that "the incident involved [] personally identifiable information the same day [as the Data Breach]". Ex. A.

31.     In other words, Defendants' investigation revealed that their network had been hacked by cybercriminals and that Defendants'' inadequate cyber and data security systems and measures allowed those responsible for the cyberattack to obtain files containing a treasure trove of thousands of Connectivity Source's former and current employees' highly sensitive PII.

32.     On or around May 10, 2023, almost a month after the Data Breach first occurred and over two weeks after Defendants had "identified all individuals whose [PII] was compromised", Connectivity Source finally notified Plaintiff and Class Members about the Data Breach. However, Plaintiff did not receive a Notice Letter from Defendants until May 17, 2023.

33.     In response to the Data Breach, Defendants contend that they have or will "take the protection and proper use of personal information very seriously" and will be taking "steps" as part of its "ongoing commitment to information privacy and the security of information". Ex. A. Although Defendants fail to expand on what these alleged "steps" are, such steps should have been in place before the Data Breach.

34.     Despite their duties and alleged commitments to safeguard PII, Defendants do not follow industry standard practices in securing former and current employees' PII, as evidenced by the Data Breach.

35.     Through the Breach Notice, Defendants also recognized the actual imminent harm and injury that flowed from the Data Breach, so they encouraged breach victims take "additional steps [] to help protect yourself, including recommendations by the Federal Trade Commission regarding identity theft protections and details on how to place a fraud alert or a security freeze on your credit file." Ex. A.  Defendants' recommendation is ironic as Defendants' failure to follow the Federal Trade Commission's recommendations regarding identity theft protection is what caused the Data Breach in the first place.

36.     On information and belief, Defendants have offered a year of complimentary credit monitoring services to victims, which does not adequately address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves PII that cannot be changed, such as Social Security numbers.

37.     Even with a year of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff's and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

38.     Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's PII. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

39.     Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's PII. Cybercriminals can cross-reference the data stolen from the Data Breach and combine this with other sources to create "Fullz" packages, which can then be used to commit fraudulent account

activity on Plaintiff's and the Class's financial accounts.

40.    On information and belief, Connectivity Source failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over its former and current employees' PII. Defendants'' negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII.

***The Data Breach was a Foreseeable Risk of Which Defendants were on Notice.***

41.    It is well known that PII, including Social Security numbers, is an invaluable commodity and a frequent target of hackers.

42.    In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[5]

43.    In light of recent high profile data breaches, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Connectivity Source knew or should have known that its electronic records would be targeted by cybercriminals.

44.    Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

45.    Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

---

[5] Data breaches break record in 2021, CNET, https://www.cnet.com/news/privacy/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last visited May 24, 2023).

46.     In the years immediately preceding the Data Breach, Defendants knew or should have known that Defendants'' computer systems were a target for cybersecurity attacks, including ransomware attacks involving data theft, because warnings were readily available and accessible via the internet.

47.     In October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[6]

48.     In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[7]

49.     In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[8]

50.     This readily available and accessible information confirms that, prior to the Data

---

[6]  High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations, FBI, available at https://www.ic3.gov/Media/Y2019/PSA191002 (last visited May 4, 2023).

[7] Ransomware mentioned in 1,000+ SEC filings over the past year, ZDNet, https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last visited May 4, 2023).

[8]   Ransomware FAQs, United States Cybersecurity and Infrastructure Security Agency, https://www.cisa.gov/stopransomware/ransomware-faqs (last visited May 4, 2023).

Breach, Defendants knew or should have known that (i) ransomware actors were targeting entities such as Defendants, (ii) ransomware gangs were ferociously aggressive in their pursuit of entities such as Defendants, (iii) ransomware gangs were leaking corporate information on dark web portals, and (iv) ransomware tactics included threatening to release stolen data.

51.    In light of the information readily available and accessible on the internet before the Data Breach, Defendants, having elected to store the unencrypted PII of thousands of their current and former employees in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII and Defendants'' type of business had cause to be particularly on guard against such an attack.

52.    Before the Data Breach, Defendants knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' PII could be accessed, exfiltrated, and published as the result of a cyberattack. Notably, data breaches are prevalent in today's society therefore making the risk of experiencing a data breach entirely foreseeable to Defendants.

53.    Prior to the Data Breach, Defendants knew or should have known that they should have encrypted its employees' Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

***Plaintiff's Experience***

54.    From approximately January 2021 to March 2021, Plaintiff John Tighe was employed by Connectivity Source.

55.    Mr. Tighe provided his PII to Connectivity Source and trusted that the company would use reasonable measures to protect it according to Connectivity Source's internal policies and state law.

56.    Defendants deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about it for a month after Defendants first

discovered the Data Breach.

57.    Plaintiff suffered actual injury from the exposure of his PII —which violates his rights to privacy.

58.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendants were required to adequately protect.

59.    As a result of the Data Breach and the recommendations of Defendants' Notice, Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords, placing a credit freeze through the three main credit bureaus, and monitoring his credit information as suggested by Defendants.

60.    Plaintiff has and will spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what PII was exposed in the Data Breach. Plaintiff has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

61.    Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties. This injury was worsened by Defendants'' delay in informing Plaintiff and Class Members about the Data Breach.

62.    Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendants'' possession, is protected and safeguarded from future

breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

63.    Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendants.

64.    The ramifications of Defendants' failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, date of birth, Social Security number, or driver's license number, without permission, to commit fraud or other crimes.

65.    The types of PII compromised and potentially stolen in the Data Breach is highly valuable to identity thieves. The employees' stolen PII can be used to gain access to a variety of existing accounts and websites to drain assets, bank accounts or open phony credit cards.

66.    Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

67.    Identity thieves can also use the stolen data to harm Plaintiff and Class members through embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits. A Presidential Report on identity theft from 2008 states that:

> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for

example, health- related or criminal record fraud, face other types of harm and frustration.

In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

68.    As a result of Defendant's' failure to prevent the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

a.    The loss of the opportunity to control how their PII is used;

b.    The diminution in value of their PII;

c.    The compromise and continuing publication of their PII;

d.    Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.    Delay in receipt of tax refund monies;

g.    Unauthorized use of stolen PII; and

h.    The continued risk to their PII, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the PII in their possession.

69.     Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

70.     The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

71.     It can take victims years to spot identity or PII theft, giving criminals plenty of time to use that information for cash.

72.     One such example of criminals using PII for profit is the development of "Fullz" packages.

73.     Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

74.     The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that

Plaintiff's and the Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

75.    Defendants disclosed the PII of Plaintiff and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendants opened up, disclosed, and exposed the PII of Plaintiff and members of the proposed Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

76.    Defendants' use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, as evidenced by its complete failure to prevent malware in its systems, demonstrates a willful and conscious disregard for privacy, and has exposed the PII of Plaintiff and the Class to unscrupulous operators, con-artists, and criminals.

77.    Defendants' failure to properly notify Plaintiff and members of the proposed Class of the Data Breach exacerbated Plaintiff's and the Class's injuries by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendants failed to adhere to FTC guidelines.***

78.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

79.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices

for business. The guidelines explain that businesses should:

     a.   protect the personal customer information that they keep;

     b.   properly dispose of personal information that is no longer needed;

     c.   encrypt information stored on computer networks;

     d.   understand their network's vulnerabilities; and

     e.   implement policies to correct security problems.

80.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

81.    The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

82.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

83.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to former and current customers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants' Offer of Credit Monitoring is Inadequate***

84.    At present, Defendants have offered a mere year long, free credit monitoring

opportunity provided by Kroll to breach victims.

85.     As previously alleged, Plaintiff's and the Class Members' PII may exist on the Dark Web and in the public domain for months, or even years, before it is used for ill gains and actions. With only a year of monitoring, and no form of insurance or other protection, Plaintiff and Class Members remain unprotected from the real and long-term threats against their personal, sensitive, and private data.

86.     Therefore, the "monitoring" services offered by Connectivity Source are inadequate, and Plaintiff and Class Members have a real and cognizable interest in obtaining equitable relief, in addition to the monetary relief requested herein.

## CLASS ACTION ALLEGATIONS

87.     Plaintiff sues on behalf of himself and the proposed Class ("Class"), defined as follows:

> **All individuals in the United States whose PII was accessed without authorization in the Defendants' Data Breach, including all those who received a notice of the Data Breach.**

88.     Excluded from the Class is Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendants have a controlling interest, any Defendants' officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

89.     Plaintiff reserves the right to amend the class definition.

90.     This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

91.     **Numerosity**. Plaintiff is representative of the proposed Class, consisting of potentially thousands of members, far too many to join in a single action;

92.     **Ascertainability**. Class members are readily identifiable from information in

17

Defendants' possession, custody, and control;

93.     **Typicality.** Plaintiff's claims are typical of Class member's claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

94.     **Adequacy.** Plaintiff will fairly and adequately protect the proposed Class's interests. His interests do not conflict with Class members' interests, and he has retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

95.     **Commonality.** Plaintiff's and the Class's claims raise predominantly common fact and legal questions that a class wide proceeding can answer for all Class members. Indeed, it will be necessary to answer the following questions:

a.   Whether Defendants had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b.   Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.   Whether Defendants were negligent in maintaining, protecting, and securing PII;

d.   Whether Defendants breached contract promises to safeguard Plaintiff and the Class's PII;

e.   Whether Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f.   Whether Defendants' Breach Notice was reasonable;

g.   Whether the Data Breach caused Plaintiff's and the Class's injuries;

h.   What the proper damages measure is; and

i.   Whether Plaintiff and the Class are entitled to damages, treble damages, or injunctive relief.

96.    Further, common questions of law and fact predominate over any individualized questions, and a class action is superior to individual litigation or any other available method to fairly and efficiently adjudicate the controversy. The damages available to individual plaintiffs are insufficient to make individual lawsuits economically feasible.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

97.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

98.    Plaintiff and members of the Class entrusted their PII to Defendants. Defendants owed a duty to Plaintiff and the Class to exercise reasonable care in safeguarding and protecting their PII and keeping it from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties. This duty included, among other things, designing, maintaining, and testing Defendants' security systems to ensure the PII of Plaintiff and the Class was adequately secured and protected, including using encryption technologies. Defendants further had a duty to implement processes that would detect a breach of its security system in a timely manner.

99.    Connectivity Source was under a basic duty to act with reasonable care when it undertook to collect, create, and store Plaintiff's and the Class's PII on its computer system, fully aware–as any reasonable entity of its size would be–of the prevalence of data breaches and the resulting harm such a breach would cause. The recognition of Defendants' duty to act reasonably in this context is consistent with, *inter alia*, the Restatement (Second) of Torts § 302B (1965), which recounts a basic principle: an act or omission may be negligent if the actor realizes or should realize it involves an unreasonable risk of harm to another, even if the harm occurs through the

19

criminal acts of a third party.

100.    Defendants knew that the PII of Plaintiff and the Class was information that is valuable to identity thieves and other criminals. Defendants also knew of the serious harms that could happen if the PII of Plaintiff and the Class was wrongfully disclosed.

101.    By being entrusted by Plaintiff and the Class to safeguard their PII, Defendants had a special relationship with Plaintiff and the Class. Plaintiff's and the Class's PII was provided to Connectivity Source with the understanding that Defendants would take appropriate measures to protect it and would inform Plaintiff and the Class of any security concerns that might call for action by Plaintiff and the Class.

102.    Defendants breached their duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class members' PII by failing to adopt, implement, and maintain adequate security measures to safeguard that information and allowing unauthorized access to Plaintiff's and the Class's PII.

103.    But for Defendants' wrongful and negligent breach of its duties owed to Plaintiff and the Class, their PII would not have been compromised, stolen, and viewed by unauthorized persons. Defendants' negligence was a direct and legal cause of the theft of the PII of Plaintiff and the Class and all resulting damages.

104.    The injury and harm suffered by Plaintiff and the Class members was the reasonably foreseeable result of Defendants' failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class members' PII.

105.    As a result of Defendants' failure, the PII of Plaintiff and the Class were compromised, placing them at a greater risk of identity theft and subjecting them to identity theft, and their PII was disclosed to third parties without their consent. Plaintiff and Class members also

suffered diminution in value of their PII in that it is now easily available to hackers on the Dark Web. Plaintiff and the Class have also suffered consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

## COUNT II
### Negligence *Per Se*
### (On Behalf of Plaintiff and the Class)

106.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

107.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's PII.

108.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect consumers' PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiff's and the Class's sensitive PII.

109.    Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

110.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

111.    Defendants had a duty to Plaintiff and the Class to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and the Class's PII.

112.    Defendants breached their respective duties to Plaintiff and members of the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's PII.

113.    Defendants' violation of Section 5 of the FTC Act and their failure to comply with applicable laws and regulations constitutes negligence *per se*.

114.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and members of the Class, Plaintiff and the Class would not have been injured.

115.    The injury and harm suffered by Plaintiff and the Class were the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that Defendants were failing to meet their duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

116.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and the Class have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of PII; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen personal information, entitling them to damages in an amount to be proven at trial.

## COUNT III
### Invasion of Privacy/Intrusion upon Seclusion
### (On Behalf of Plaintiff and the Class)

117.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

118.    The State of Texas recognizes the tort of Intrusion upon Seclusion, and adopts the

formulation of that tort found in the Restatement (Second) of Torts, which states:

> One who intentionally  intrudes, physically or otherwise, upon the
> solitude  or seclusion  of another or his private affairs or con
> cerns, is subject to liability to the other for invasion  of his
> privacy, if the intrusion would be highly offensive to a reaso
> nable  person.

Restatement (Second) of Torts§ 652B (1977).

119.    Plaintiff and the Class had a legitimate expectation of privacy regarding their highly

sensitive and confidential PII and were accordingly entitled to the protection of this information

against disclosure to unauthorized third parties.

120.    Defendants owed a duty to its current and former employees, including Plaintiff

and the Class, to keep this information confidential.

121.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class

members' PII is highly offensive to a reasonable person.

122.    The intrusion was into a place or thing which was private and entitled to be private.

Plaintiff and the Class disclosed their sensitive and confidential information to Defendant, but did

so privately, with the intention that their information would be kept confidential and protected

from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such

information would be kept private and would not be disclosed without their authorization.

123.    The Data Breach constitutes an intentional interference with Plaintiff and the

Class's interest in solitude or seclusion, either as to their person or as to their private affairs or

concerns, of a kind that would be highly offensive to a reasonable person.

124. Defendants acted with a knowing state of mind when they permitted the Data Breach because they knew its information security practices were inadequate.

125. Defendants acted with a knowing state of mind when they failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

126. Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

127. As a proximate result of Defendants' acts and omissions, the private and sensitive PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed supra).

128. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII are still maintained by Defendants with their inadequate cybersecurity system and policies.

129. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiff and the Class.

130. In addition to injunctive relief, Plaintiff, on behalf of himself and the other Class members, also seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## COUNT IV
### Breach of Implied Contract
### (On behalf of Plaintiff and the Class)

131.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

132.    Plaintiff and the Class entrusted their PII to Defendants at the time they entered into an employment relationship with Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

133.    Plaintiff and Class members reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and its internal policies.

134.    In turn, and through internal policies, Defendants agreed to protect and not disclose the PII to unauthorized persons.

135.    Implicit in the parties' agreement was that Defendants would provide Plaintiff and Class members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

136.    After all, Plaintiff and Class members would not have entrusted their PII to Defendants or their third-party agents in the absence of such an agreement with Defendant.

137.    Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

138.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties

according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

139.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

140.    Defendants materially breached the contracts they entered with Plaintiff and Class members by:

    a.   failing to safeguard their information;

    b.   failing to notify them promptly of the intrusion into its computer systems that compromised such information.

    c.   failing to comply with industry standards;

    d.   failing to comply with the legal obligations necessarily incorporated into the agreements; and

    e.   failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

141.    In these and other ways, Defendants violated their duty of good faith and fair dealing.

142.    Defendants' material breaches were the direct and proximate cause of Plaintiff and Class members' injuries (as detailed *supra*).

143.    Plaintiff and Class members performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

**COUNT V**
**Unjust Enrichment**

**(On Behalf of Plaintiff and the Class)**

144.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

145.    This claim is pleaded in the alternative to the breach of implied contract claim.

146.    Plaintiff and Class Members conferred a monetary benefit on Defendants, by providing Defendants with their valuable PII. They also conferred a benefit on Defendants by providing their employment services.

147.    Defendants appreciated or had knowledge of the benefits it received from Plaintiff and Class members.

148.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII and by retaining the benefit of Plaintiff's and the Class's labor.

149.    Plaintiff and Class members reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and its internal policies.

150.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class members' PII.

151.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid its data security obligations at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

152.    Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and Class members' payment because Defendants

failed to adequately protect their PII.

153.    Plaintiff and Class members have no adequate remedy at law.

154.    Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class members—all unlawful or inequitable proceeds that it received because of its misconduct.

**COUNT VI**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

155.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

156.    Given the relationship between Defendants and Plaintiff and Class members, where Defendants became guardians of Plaintiff's and Class members' PII, Defendants became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class members, (1) for the safeguarding of Plaintiff's and Class members' PII; (2) to timely notify Plaintiff and Class members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and do store.

157.    Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of Defendants' relationship with them—especially to secure their PII.

158.    Because of the highly sensitive nature of the PII, Plaintiff and Class members would not have entrusted Defendant, or anyone in Defendants' position, to retain their PII had they known the reality of Defendants' inadequate data security practices.

159.    Defendants breached their fiduciary duties to Plaintiff and Class members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class members' PII.

160.    Defendants also breached their fiduciary duties to Plaintiff and Class members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

161.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**PRAYER FOR RELIEF**

162.    Plaintiff and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

C.    Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

D.    Enjoining Defendants from further deceptive practices and making untrue statements about the Data Breach and the stolen PII;

E.    Awarding Plaintiff and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.    Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G.    Awarding attorneys' fees and costs, as allowed by law;

H.    Awarding prejudgment and post-judgment interest, as provided by law;

I.    Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.    Granting such other or further relief as may be appropriate under the circumstances.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

DATED:  May 31, 2023                    Respectfully submitted,


*/s/ Joe Kendall*
JOE KENDALL
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
Telephone:  214/744-3000 / 214/744-3015 (fax)
jkendall@kendalllawgroup.com

Samuel J. Strauss
sam@turkestrauss.com
Raina C. Borrelli
raina@turkestrauss.com
**TURKE & STRAUSS LLP**
613 Williamson St., Suite 201
Madison, WI 53703
Telephone (608) 237-1775
Facsimile: (608) 509-4423

***Attorneys for Plaintiff***